# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Osha Joseph,

                      Plaintiff,
                                          **MEMORANDUM OPINION**
                                          **AND ORDER**
        v.                                          Civil No. 17-4712 ADM/SER

Sgt. Bobby Donahue,
Sgt. Tom Arnold,
Officer Mon Notthakun,
and Officer Marshall Titus,
in their individual and official capacities,
as police officers for the
City of Saint Paul, and
the City of Saint Paul,

                      Defendants.

_____

Adam T. Johnson, Esq., Lundgren & Johnson, PSC, Minneapolis, MN, on behalf of Plaintiff.

Lawrence J. Hayes, Jr., Esq., Office of the City Attorney, St. Paul, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On March 6, 2019, the undersigned United States District Court Judge heard oral argument on the Motion for Summary Judgment [Docket No. 12] brought by Defendants Sergeant Bobby Donahue ("Sergeant Donahue"), Sergeant Tom Arnold ("Sergeant Arnold"), Officer Mon Notthakun ("Officer Notthakun"), Officer Marshall Titus ("Officer Titus"), and the City of Saint Paul (collectively, "Defendants").  Defendants assert qualified and official immunity bar all of Plaintiff Osha Joseph's ("Joseph") federal and state law claims.  For the reasons set forth below, Defendants' motion for summary judgment is granted.

## II. BACKGROUND[1]

On the night of July 9, 2016, approximately 300 protesters marched on U.S. Interstate 94 in St. Paul, Minnesota to protest a police officer's fatal shooting of a citizen three days earlier. Compl. [Docket No. 1, Attach. 1] ¶¶ 11–12; First Hayes Aff. [Docket No. 15] Ex. 2 ("Defs.' Ex. 2") at STP 0058. The shooting victim was Joseph's second cousin. First Hayes Aff. Ex. 9 ("Joseph Dep.") at 48–49. During the protest, people in the crowd began throwing bricks, construction debris, glass bottles, and explosive fireworks at police officers. Defs.' Ex. 2 at STP 0071. One officer was injured when the blast from an explosive hit her leg. Id. Another officer was struck in the face with a glass bottle. Id.

Two officers observed an adult black male wearing a red t-shirt and white pants throw large rocks and construction debris at the police. Id. at STP 0071, STP 0091. The officers pointed the male out to a third officer possessing a marking gun loaded with green dye. Id. at STP 0071. The third officer aimed and shot the marking gun at the male, hitting his right leg and leaving a green dye mark on his white pants. Id.

Later that evening, a man called the St. Paul Police Department to report he had been at the protest and saw the occupants of a black GMC Yukon throwing Molotov cocktails at police officers. Id. at STP 0058. The caller provided the license plate number of the GMC Yukon and described the vehicle's occupants as two black males and a black female. Id.

At approximately 10:15 a.m. the next morning, St. Paul police located the Yukon parked across from 372 East Cook Avenue and began conducting surveillance on the vehicle. Id. at STP

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

0097. Approximately three hours later, while Sergeant Donahue, Sergeant Arnold, and Sergeant Michael Wills ("Sergeant Wills") were conducting surveillance, Sergeant Donahue saw a black male wearing a red shirt and white pants walk from the East Cook Avenue residence to the Yukon and get into the driver's seat. Id. at STP 0061, STP 0063; First Hayes Aff. Ex. 4 ("Defs.' Ex. 4") at STP 0007. A second black male wearing jeans and a dark shirt then approached the vehicle from the same residence. Defs.' Ex. 2 at STP 0063. The second male stood at the driver's door for a short time and then returned to the residence. Id. A black female approached the Yukon from a vehicle parked on the other side of the street and got into the front passenger seat. Id. The Yukon pulled into the middle of the street, and the male driver got out and walked back to the 372 East Cook Avenue residence. Id. The female moved to the driver's seat, and the male who had earlier exited the Yukon returned from the Cook Avenue home and got into the vehicle's passenger seat. Id.

The Yukon then pulled away and began heading west. Id. Sergeants Donahue and Arnold followed the Yukon until assisting squad cars in the area arrived and initiated a traffic stop. Id.; Defs.' Ex. 4 at STP 0007. The man in the vehicle was identified as Louis Hunter ("Hunter"). Defs.' Ex. 4 at STP 0008. He was wearing a red shirt and white pants and had green marking dye on his pants. Defs.' Ex. 2 at STP 0072. Hunter and the woman were transported to the police station for questioning. Defs.' Ex. 4 at STP 0008. After being interviewed, Hunter was booked into Ramsey County jail for second degree assault. Id.

Sergeants Donahue and Arnold returned to the 372 East Cook Avenue residence to investigate whether evidence from the previous night's assault on police officers may have been left in the home by Hunter or others who had been in the Yukon. Defs.' Ex. 2 at STP0063; First

Hayes Aff. Ex. 5 ("Donahue Dep.") at 7–9. Also assisting were Officer Notthakun and his partner Officer Heather Grulkowski, Officer Titus and his partner Officer Christopher Rhoades, and Sergeant Wills. Defs.' Ex. 2 at 0061; Defs.' Ex. 4 at 0001, 0011, 0013.

Upon arriving at the Cook Avenue residence, Sergeants Donahue and Arnold walked from their squad car to the house to speak with a woman near the front door. Donahue Dep. at 7–8. The woman identified herself as Yvette Joseph and informed the officers she was the renter of the home. Defs.' Ex. 2 at STP 0061, STP 0063; Donahue Dep. at 7–9, 20. Yvette Joseph is Plaintiff Osha Joseph's mother. She told the officers she had attended the protest the night before and that Hunter had given her a ride home in the Yukon. Defs.' Ex. 2 at STP 0063. She did not witness anyone throwing Molotov cocktails. Id. at 0067. She also stated that Hunter did not stay the night at her house, but she saw the Yukon still parked outside her home at 2:30 a.m. when she went to bed. Id. To her knowledge, the vehicle remained there until Hunter returned with his girlfriend that morning to retrieve it. Id.

The officers asked Yvette Joseph if they could perform a protective sweep of the home. Id. at 0063. She told them no one was inside the house and gave consent for the sweep. Id. After completing the protective sweep, the officers exited the home and asked Yvette Joseph for consent to search the home. Id. at STP 0064. Yvette Joseph granted consent and signed a written Waiver and Consent to Search form. Id. at STP 0061, 0063; First Hayes Aff. Ex. 3.

At the time the officers first approached Yvette Joseph's home to speak with her, Osha Joseph had been sitting with his girlfriend in a car parked outside the house. Joseph Dep. at 26–27, 77; Donahue Dep. at 7. Osha Joseph and his girlfriend had been temporarily living with his mother for about a month or so. Joseph Dep. at 23–24, 65, 67, 77; First Hayes Aff. Ex. 6

4

("Arnold Dep.") at 9.

When Joseph saw the police, he got out of the car with his hands up and started screaming his mother's name. Joseph Dep. at 26. Keeping his hands in the air, Joseph walked to the front lawn and screamed to his mother that the officers could not search the residence without a warrant. Id. at 27–28, 78; First Hayes Aff. Ex. 7 ("Titus Dep.") at 6. The deposition testimony of Sergeant Donahue, Sergeant Arnold, and Officer Titus is that Joseph became belligerent and confrontational at this time, and was waving his arms threateningly and swearing at the officers. Donahue Dep. at 7–8, 16; Arnold Dep. at 6–8; Titus Dep. at 10, 14. Officer Notthakun testified in his deposition that Joseph was being verbally aggressive but did not engage in any threatening physical contact. First Hayes Aff. Ex. 8 ("Notthakun Dep.") at 7–8. Joseph testified in his deposition that he was screaming for his mother, but does not recall yelling or swearing at the officers. Joseph Dep. at 27–28. He further testified his hands were up the entire time, but he was not waving his arms or making threatening gestures to the police. Id. at 28–29, 78–79.

Joseph's behavior caused Sergeant Donahue to become concerned for the officers' safety if they were given permission to search the house. Donahue Dep. at 10, 14–15. Sergeant Donahue did not yet know whether Joseph had been involved in the assaults on the police officers that had taken place at the protest the previous night. Id. at 14. Sergeant Donahue felt the officers' safety would be compromised if they had to look over their shoulders while searching the house to make sure they would not be attacked. Id. at 15. Sergeant Donahue also believed that Joseph might flee. Id. Based on these concerns, Sergeants Donahue and Arnold ordered that Joseph be detained in a squad car while the officers searched the house. Id. at

14–15; Arnold Dep. at 9–10; Defs.' Ex. 4 at STP 0013.

Officers Titus and Notthakun escorted Joseph to the squad car. Defs.' Ex. 4 at STP 0013; Titus Dep. at 7–8. Joseph, wearing a medical boot on his right foot, walked slowly to the car. Defs.' Ex. 4 at STP 0013. The squad car video footage of the squad car interior shows the entire duration of Joseph's detention. See generally First Hayes Aff. Ex. 1 ("Video"). As the car door is opened, Joseph can be heard yelling at Officer Titus. Id. at 14:12:28. Joseph was agitated and reluctant to get in the car, telling Officer Titus that he did not have a record and was claustrophobic. Id. at 14:12:36–48. He sat on the rear seat with his feet dangling outside the vehicle and asked if the door could remain open. Id. at 14:12:50.

Officer Titus asked Joseph for his identification information and he refused to provide it, saying "I don't even want to talk to y'all. Y'all killed my cousin." Video at 14:12:58–14:13:03. Officer Titus again asked Joseph for his name and told him "We can always bring you down to the jail and have you fingerprinted." Video at 14:13:16–20. Joseph again refused to answer, telling Officer Titus that he didn't do anything. Id. at 14:13:21–25. Officer Titus asked Joseph a third time, and this time Joseph complied by stating his name and date of birth, and telling Officer Titus that he resided "right here." Id. at 14:13:26–52; Joseph Dep. at 39. Officer Titus then instructed Joseph to place his feet in the vehicle and make himself comfortable. Video at 14:13:55–14:14:05; Defs.' Ex. 4 at STP 0013; Titus Dep. at 13.

Officer Notthakun then closed the door of the squad car and Joseph immediately screamed from inside the car. Defs.' Ex. 4 at STP 0013; Video at 14:14:06. Officer Notthakun reopened the door, and Joseph yelled that the door had been shut on his left foot. Defs.' Ex. 4 at STP 0014; Video at 14:14:10. Officer Notthakun asked Joseph whether he wanted a medic, and

Joseph shouted that he did. Video at 14:14:40–48; Defs.' Ex. 4 at STP 0014. Officer Notthakun closed the door until the paramedics arrived seven minutes later. Defs.' Ex. 4 at STP 0002, STP 0014; Video at 14:22:02.

The squad car door was opened for four minutes while paramedics examined Joseph's foot. Video at 14:21:54–2:26:13. The paramedics told Joseph his foot was not broken and he did not need to go to the hospital. Id. at 14:24:18–55. He was given an ice pack to apply to his foot. Titus Dep. at 15; Video at 14:25:53. Joseph then began to shout about having to be in the hot car when he was "not even arrested." Id. at 14:25:00–16. He asked Officer Titus to inquire with his supervisor about whether Joseph could get out of the car. Id. at 14:25:20. Officer Titus responded that he would do so, but that meanwhile Joseph needed to "sit tight" and that they would "crank up the a/c" and let the windows down for a "nice breeze." Id. at 14:25:21–31. The door was then closed at 2:26 p.m. and remained locked until 2:41 p.m.

During this 15-minute period, Joseph erupted into angry outbursts every minute or so, shouting that he wanted to get out of the car, that he was in pain and needed to go to the hospital, and was hot. See, e.g., id. at 14:27:11–29, 14:28:35–49, 14:29:20–35. Also during this time frame, Officer Titus returned from speaking to his supervisor, Sergeant Donahue, and told Joseph that he needed to remain in the squad car until Sergeant Donahue instructed otherwise. Titus Dep. at 17–18; Video at 14:30:30. Sergeant Donahue determined Joseph must remain in the car because he was "yelling and screaming" so loudly that Sergeant Donahue could hear him from inside the house across the street. Donahue Dep. at 16; Titus Dep. at 21. Based on this behavior, Sergeant Donahue did not want to allow Joseph out of the car while the police were there. Donahue Dep. at 16–17. Joseph responded to Officer Titus by yelling that he was in pain

and needed to go to the hospital, and proceeded to shout angrily at Officer Titus for over a minute.  Id. 14:30:33–14:31:55.

At 2:32 p.m., shortly after his angry exchange with Officer Titus, Joseph can be seen leaning out the rear window and shouting to his girlfriend, "Record the fact that he just shut my fucking window so I could be in this hot!"  Id. at 14:32:06–17.  Approximately two minutes later, Joseph yelled that he needed his inhaler and that it was "hot as fuck."  Id. at 14:34:00–19; Defs.' Ex. 4 at STP 0014.  At 2:38, Joseph became enraged and began screaming to be let out of the car.  He punched and kicked the squad car door and yelled that he had done nothing wrong, did not have a record, was hot, and did not deserve to be in the car.  Video at 14:38:50–14:41:19.

At 2:41, Officer Titus opened the door to inform Joseph he was not under arrest.  Joseph responded by shouting that he was innocent and that he was hot and had asthma.  Id. at 14:41:35–59.  Officer Titus told Joseph to settle down and offered to help him relax by turning up the air conditioning and rolling the windows further down.  Id. at 14:42:00–30.  After the door had been open for one minute, Officer Titus closed it at 2:42.  Id. at 14:42:40.

Several seconds after the door had been shut, Joseph began rocking back and forth and breathing heavily.  An officer can be heard telling him to "Take a deep breath, man."  Id. at 14:42:57.  After rocking back and forth for approximately a minute, Joseph began coughing and gagging.  14:43:34.  He leaned over and heaved a saliva-like substance onto the floor of the squad car.  Id. at 14:43:41–14:44:48; Joseph Dep. at 73–75.  Joseph yelled out an open window that he was throwing up and could not breathe.  Video at 14:44:50.  Within seconds, two officers responded by walking to the squad car and opening the door.  Id. at 14:45:15.  Joseph leaned out the door and spit thick mucous outside the vehicle.  Id. at 14:45:15–44; Defs.' Ex. 4 at STP

0014; Joseph Dep. at 37.  The officers then provided Joseph with an inhaler they had obtained

from his mother, and Joseph used the inhaler.  Video at 14:46:45–14:47:40; Defs.' Ex. 4 at

STP 0014; Donahue Dep. at 17.

The officers then closed the door, which had been open for two minutes.  The door

remained shut for 22 minutes.  Video at 14:47:55–15:10:10.  During this 22-minute period,

Joseph can be seen leaning out the window to cough and to shout to his girlfriend.  See, e.g., id.

at 14:52:19–28, 14:54:15–28.  His girlfriend or mother can be heard telling him to "calm down."

Id. at 14:54:27–29.  At 3:00 p.m., Joseph leaned out the window to ask for a cigarette and said he

"could blow it out the window."  Id. at 15:00:10 –15:01:21.  He also said he did not understand

why he was in the car and that he was going to "freak the fuck out again" because he was

claustrophobic.  Id. at 15:01:52–15:02:09.  At 3:07 p.m., Joseph yelled to his mother to tell the

police to "get the fuck out of your house or something, please.  They ain't got no warrant, no

nothing."  Id. at 15:07:02–07.

At 3:09, Joseph's girlfriend spoke to him through the rear window of the squad car and

told him to calm down and "act right."  Id.  at 15:09:25–55.  At 3:10, the officers completed the

search of the home and released Joseph from the car.  Defs.' Ex. 2 at STP 0061, 0064; Arnold

Dep. at 11; Video at15:10:10.

The officers found nothing of evidentiary value from their search of the home.  Defs.'

Ex. 2 at STP0061.  They interviewed Yvette Joseph, Osha Joseph, and Osha Joseph's girlfriend,

and thanked them for their cooperation.  Defs.' Ex. 2 at STP 0068.  No charges were filed

against them.

Joseph's detention in the squad car totaled 55 minutes.  Although Joseph testified in his

deposition that the squad car windows were rolled up while he was in the car, the squad car video footage undisputably shows Joseph leaning his head out the window several times during his detention, and he is seen talking to others outside the window and suggesting he can blow cigarette smoke out the window. Joseph Dep. at 36–37; see generally Video. The video also shows that the rear door of the squad car was opened three separate times for a total of 8 minutes. The longest period of time the door remained closed between openings was 22 minutes.

Officer Notthakun's police report states that the air conditioning was on full power in the squad car. Defs.' Ex. 4 at STP 0014. However, Joseph testified in his deposition that the partition blocked the cool air from getting to the rear seat. Joseph Dep. at 36. The squad car video does not establish whether the partition was opened or closed. Because this is a disputed fact, the Court will assume the air conditioning did not cool the rear seat area.

Joseph has not produced any medical documentation of injuries he claims to have received on July 10, 2016. Second Hayes Aff. [Docket No. 23] ¶ 9. During his deposition, Joseph testified that he went to Regions Hospital after the incident and was diagnosed with a left foot sprain caused by the squad door being slammed on his foot. Joseph Dep. at 14–16. After being informed that his Regions Hospital medical records do not indicate he was ever seen for a left foot sprain occurring on July 10, 2016, Joseph testified that he might have gone to United Hospital or St. Joseph's Hospital, but could not recall which one. Id. at 68–69. Joseph also testified he was injured by the hot and confined conditions of the squad car because he has asthma, is claustrophobic, and was throwing up. Id. at 15–16. He testified that he did not receive medical treatment for any of those conditions. Id. at 16.

After Joseph filed this case in Minnesota state court, Defendants removed it to federal court. Joseph asserts claims under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment based on unlawful seizure, unlawful arrest, unlawful detention, and excessive force. Joseph also asserts state law claims for false imprisonment and battery. Defendants move for summary judgment, arguing qualified immunity bars Joseph's § 1983 claims and official immunity bars his state law claims.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states a court shall grant summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted). However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). "In order to survive a motion for summary judgment under § 1983, the plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006) (citing Kuha v. City of Minnetonka, 365

F.3d 590, 596 (8th Cir. 2003)).

## B. Section 1983 Claims and Qualified Immunity

"Section 1983 imposes liability for certain actions taken 'under color of' state law that deprive a person 'of a right secured by the Constitution and laws of the United States.'" Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005), (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)). Joseph alleges Defendants acted under color of state law to deprive him of his right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution. Defendants argue Joseph's § 1983 claims are barred by qualified immunity.

"Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013). A police officer is entitled to qualified immunity unless the facts shown by the plaintiff establish "(1) that a plaintiff's constitutional rights have been violated, and (2) those rights were so clearly established at the time of the violation that a reasonable officer would have known that his actions were unlawful." Ulrich v. Pope Cty., 715 F.3d 1054, 1058 (8th Cir. 2013).

"[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." White v. Pauly, 137 S. Ct. 548, 551 (2017) (quotation marks and citations omitted). Additionally, "the clearly established law must be particularized to the facts of the case. Otherwise, [p]laintiffs would be able to convert the rule

of qualified immunity . . . into a rule of virtually unqualified liability by simply alleging violation of extremely abstract rights." Id. at 552 (quotation marks and citations omitted, alteration in original).

"When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." Bishop v. Glazier, 723 F.3d 957, 961 (8th Cir. 2013).

### 1. Unlawful Seizure (Count I)

The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." When an officer restrains a person's freedom to walk away, the officer has seized that person. Brower v. Cty. of Inyo, 489 U.S. 593, 595 (1989). However, a seizure standing alone is not sufficient for § 1983 liability; the seizure must also be unreasonable. Id. at 599; Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009) ("To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure has occurred and the seizure was unreasonable.").

Defendants argue they are entitled to qualified immunity on Joseph's unlawful seizure claim because Joseph's detention in the squad car for less than an hour was reasonable. Defendants insist the temporary detention was necessary to protect their safety and to prevent Joseph from actively interfering in the officers' consensual search of his mother's home.

Joseph disagrees, arguing his detention was unlawful because it was not in furtherance of a legitimate search. Joseph contends the officers lacked valid consent for the search because he was a physically present co-occupant of the home and expressly refused to consent to a police

13

search.  Joseph argues that any consent his mother may have given for the search is not valid in light of his express refusal of consent.  Alternatively, Joseph argues his mother's consent to search was coerced.

### a. Validity of Yvette Joseph's Consent

Joseph cites to Georgia v. Randolph to argue that his mother's consent to search the home was not valid over his objection.  547 U.S. 103 (2006).  In Georgia v. Randolph, the Supreme Court addressed whether one occupant may give law enforcement effective consent to search a shared premises when the co-occupant is present and refuses permission to search.  Id. The shared premises in Randolph was a marital residence, and the defendant's wife had called police to the home after a domestic dispute.  Id. at 106–07.  The defendant and his wife were both present when the police arrived.  Id. at 107.  The wife told the officers her husband was a drug user and that there was drug evidence in the house.  Id.  The officers asked the defendant for permission to search the house and he refused.  Id.  The officers then turned to the defendant's wife for consent to search, which she gave.  Id.  She then led officers to a bedroom in the home where evidence of drug use was found.  Id.

In determining whether the search was reasonable, the Supreme Court emphasized that "[t]he constant element in assessing Fourth Amendment reasonableness in . . . consent cases . . . is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules."  Id. at 111.  Thus, "whether the consenting tenant has the right to admit the police when a physically present fellow tenant objects" depends on "whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection."  Id. at 121.

With regard to customary expectations, the Supreme Court observed:

> [I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, "stay out." Without some very good reason, no sensible person would go inside under those conditions.
> . . .
>
> The visitor's reticence . . . would show not timidity but a realization that when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation, not by appeals to authority. Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior [authority among disagreeing tenants].

Id. at 113–14. Based on this commonly shared societal understanding, the Supreme Court held that if a "co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." Id. at 114. Because the defendant's wife in Randolph had no legal or socially recognized authority to prevail over her husband's objections, the warrantless search was unreasonable. Id. at 114, 122–23.

The Supreme Court emphasized the narrowness of its holding by drawing the following "fine line":

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>
> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of

> avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

Id. at 121–22.

Joseph argues that under <u>Randolph</u>, his express refusal of consent invalidated any consent his mother gave.  The argument lacks merit because the circumstances here differ from <u>Randolph</u> in at least two significant respects.  First, unlike the wife in <u>Randolph</u>, Yvette Joseph possessed "recognized authority in law [and] social practice to prevail over [her] present and objecting co-tenant."  <u>Id.</u> at 114.  Social practice recognizes Yvette Joseph's authority as superior because she and Osha Joseph "fall within [a] recognized hierarchy," namely "a household of parent and child."  <u>Id.</u>  The law also recognizes Yvette Joseph's superior authority to admit others into her home over her son's objections.  Indeed, the Supreme Court has observed that an adult son or daughter living temporarily in their parents' home does not have "untrammeled power" to admit or exclude others from the home, because the "right to admit or exclude would be subject to [their] parents' veto."  <u>Minnesota v. Olson</u>, 495 U.S. 91, 99–100 (1990).  As the permanent occupant of the home, Yvette Joseph was a host to her adult son, who was temporarily staying with her.  A host "has ultimate control of the home" and "may admit or exclude from the house as [s]he prefers," even over the objection of her guest.  <u>Id.</u> at 99.  Although an overnight guest has a "legitimate expectation of privacy" in the home, the guest has "no legal interest in the premises and do[es] not have the legal authority to determine who may or may not enter the household."  <u>Id.</u>  Thus, Yvette Joseph had authority recognized in law and social practice to prevail over her son's objection.

The second material way in which this case differs from Randolph is that Osha Joseph was in the yard and was not part of the conversation the police were having with his mother near the front door. Osha Joseph was not "in fact at the door and object[ing]," but was instead "nearby but not invited to take part in the threshold colloquy." Randolph, 547 U.S. at 121. Under the "fine line" drawn by the Supreme Court, Osha Joseph "loses out." Id.; see also United States v. Witzlib, 796 F.3d 799, 801–02 (7th Cir. 2015) (holding the warrantless search of a house where defendant lived with his grandmother was lawful based on his grandmother's consent to search, despite defendant's objecting to the search while standing in the driveway).[2]

### b. Coercion

Joseph also challenges the validity of the consent on a separate ground, arguing the Defendant Officers coerced his mother into consenting to the search by keeping him in a hot squad car until her consent was given. Joseph contends that his mother, "presented with her son having an asthma attack in the squad car, was obviously coerced." Pl.'s Mem. Opp'n Summ. J. [Docket No. 18] at 14. The facts of record do not support this argument. The Waiver and Consent to Search form signed by Yvette Joseph states that her consent was "freely and voluntarily given of [her] own free will and accord." First Hayes Aff. Ex. 3. Yvette Joseph did

---

[2] To the extent Joseph argues the police removed him from the entrance to avoid a possible objection, this argument is unavailing. As long as the officers' removal of Joseph by placing him in the squad car was objectively reasonable, any subjective motive the officers may have had will not invalidate their justifiable behavior. See Fernandez v. California, 571 U.S. 292, 302 (2014) ("The Randolph dictum [about removing the potentially objecting defendant from the entrance] is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable."). For the reasons discussed in Paragraph III.B.1.c., Joseph's removal from the front yard and placement in the squad car was objectively reasonable.

not appear for her deposition that was scheduled in this case, and Osha Joseph's counsel

admitted that he did not subpoena her for deposition. Second Hayes Aff. [Docket No. 23]

¶¶ 3–4, Ex. A. Additionally, Joseph has not submitted an affidavit under oath from his mother

supporting the claim that her consent to a search of her premises was coerced by the Defendants.

Id. ¶¶ 5–6. Based on Yvette Joseph's representation in the Waiver and Consent to Search form

stating her consent was freely and voluntarily given, and in the absence of any testimony from

her stating otherwise, no reasonable jury could conclude that Yvette Joseph's consent was

coerced.

### c. Reasonableness of Seizure

Having determined the officers had valid consent to search the home, the Court next

considers whether it was reasonable for the officers to place Joseph in the squad car while the

search was conducted.

It is well established that law enforcement officers executing a search warrant are

permitted to detain the occupants of the premises while a proper search is conducted. Bailey v.

United States, 568 U.S. 186, 193 (2013); Michigan v. Summers, 452 U.S. 692, 701–02 (1981).

The officers are not required to have a particular suspicion that a detained occupant is involved

in criminal activity or poses a specific danger to them. Bailey, 568 U.S. at 193. "[P]ermitting

the detention of occupants on the premises during the execution of a search warrant, even absent

individualized suspicion, [is] reasonable and necessary in light of the law enforcement interests

in conducting a safe and efficient search." Id. at 200. The detention allows officers to search the

premises without fear that occupants who are present and observing the search will become

dangerous or disrupt the search. Id. at 195. "[D]etaining those present also prevents the search

from being impeded by occupants leaving with the evidence being sought or the means to find it." Id. at 198.

Here, the Defendant officers did not have a search warrant, but they were given consent to search the home by Joseph's mother. The officers thus had a lawful basis to search the home and to detain Joseph so they could conduct a safe and efficient search without fear that Joseph would become dangerous or frustrate the search.

Detaining Joseph in the squad car was objectively reasonable because Joseph's behavior caused them to be concerned for their safety while they conducted the search. Although Joseph disputes that he was waving his hands or making threatening gestures to the officers, there is no dispute that he was holding his hands in the air and screaming. He also objected to the search of his mother's home and initially refused to comply with Officer Titus' request that he identify himself. The officers were investigating a felony assault on police officers and did not yet know whether Joseph was one of the individuals who had been in the suspect vehicle. Based on Joseph's conduct, the officers were reasonable in believing that Joseph might interfere with their lawful search and threaten their safety if they did not limit his freedom of movement.

Joseph argues the officers could have used less intrusive means of confining him than locking him in a squad car. He argues he was not a flight risk given the medical boot on his foot, and that the presence of approximately seven police officers on the scene ameliorated any threat to police safety. Joseph suggests the officers could have ordered him to remain in his yard or porch area. However, given Joseph's demonstrated opposition to the search, his argumentative demeanor, and his resistance to the officers' commands, the officers could reasonably conclude that Joseph's obstructive and unpredictable behavior would continue and that he would interfere

with the search or threaten their safety if permitted to remain in the yard or on the porch.  See, e.g., Waters v. Madson, 921 F.3d 725, 738 (8th Cir. 2019) (holding that officers who did not know a suspect's background and had witnessed the suspect's uncooperative and evasive behavior "could reasonably conclude that [the suspect's] unpredictable behavior would continue to escalate and that handcuffing him and briefly placing him in the squad car was the least intrusive means of maintaining the status quo and protecting [the suspect], themselves, and bystanders while the officers investigated"); United States v. Smith, 645 F.3d 998, 1002–03 (8th Cir. 2011) (holding that after a suspect became agitated and refused an officer's request to search his car, the officer could maintain the status quo by handcuffing a suspect and placing him in the back of a squad car while waiting for a drug-sniffing dog to arrive).  Indeed, even from the squad car Joseph continued to object to the officers' search of the home that was being conducted with the valid consent of his mother.  Video at 15:07:02.

Additionally, the intrusiveness of his detention was minimized while Joseph was confined in the squad car.  He was not handcuffed, the windows were rolled down, he was treated by paramedics, and he was given an ice pack and an inhaler.  Thus, the officers used the least intrusive means reasonably available to detain Joseph.

Because the Defendant Officers' seizure of Joseph was objectively reasonable under the circumstances, the seizure did not violate the Fourth Amendment.  Defendants are entitled to qualified immunity on the § 1983 claim for unlawful seizure in Count I.

## 2. Unlawful Arrest (Count II)

Defendants argue they are entitled to qualified immunity on Joseph's claim of unlawful arrest because he was not arrested.  Joseph responds that his detention in the squad car

constituted a de facto arrest that was not supported by probable cause.

"An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006). The "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the [detention]. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994) (internal quotation omitted). There is "no rigid time limitation" on an investigative detention, but it may not involve "delay unnecessary to the legitimate investigation of the law enforcement officers." United States v. Sharpe, 470 U.S. 675, 685–87 (1985). The reasonableness of the length of detention depends on the circumstances. See, e.g., id. at 685 (finding 20 minute detention reasonable where officers acted diligently and defendant contributed to the delay); United States v. Maltais, 403 F.3d 550, 557 (8th Cir. 2005) (holding detention of almost three hours reasonable where officer was awaiting the arrival of a drug dog at a remote location); Bloomfield, 40 F.3d at 917 (holding hour-long detention reasonable where officer was awaiting the arrival of a drug dog); but see United States v. Place, 462 U.S. 696, 709–10 (1983) (holding 90 minute detention of luggage unreasonable where agents did not act diligently to minimize the delay).

Here, Joseph's detention of slightly less than an hour was no longer than was necessary to effectuate the purpose of the detention—the search of the residence. Joseph provides no argument, much less evidence, that the officers engaged in unnecessary delay while conducting the search inside the home. Joseph was promptly released when the search ended. Additionally,

during Joseph's detention, the officers assessed whether his continued detention in the squad car was warranted. Twenty minutes after initially detaining Joseph, Officer Titus consulted with Sergeant Donahue about the status of the search and whether Joseph could be released. Sergeant Donahue determined that Joseph's continued detainment in the squad car was necessary because Joseph was continuing to shout loudly enough to be heard from inside the house. Cf. Magnan v. Doe, No. 11–753, 2012 WL 5247325, at *7 (D. Minn. July 6, 2012) (finding detention lasted longer than necessary where officers did not consider whether continued detention was warranted). Here, the length of the investigative detention was reasonable.

Further, Joseph's detention in the squad car was the least intrusive means of detaining him during the search. Factors considered in determining the reasonableness of the means used to effect the seizure include whether the detainee could be armed or dangerous, whether the officers are investigating a dangerous crime, whether the detainee is engaging in suspicious or disruptive behavior, whether the officers conducted a basic investigation prior to the detention, and whether the officers had an opportunity to detain the individual in a less intrusive manner. El-Ghazzawy v. Berthiaume, 636 F.3d 452, 457–58 (8th Cir. 2011).

Applying these factors to the present facts leads to the conclusion that the officers used the least intrusive means to effect the seizure. Although there is no evidence that Joseph was armed and dangerous, the officers were investigating a dangerous crime—assault on a police officer—and Joseph was engaging in disruptive behavior by screaming and refusing to be compliant with routine identification procedures. Additionally, the officers had been actively investigating the assault prior to Joseph's detention. The investigation including tracking the suspect vehicle to Yvette Joseph's home and observing an individual exit the home and leave in

the vehicle. The officers knew that Osha Joseph was staying at the home, but did not yet know Joseph's involvement, if any, in the assault on the police. Lastly, the officers did not have an opportunity to detain Joseph in a less intrusive manner, because his uncooperative and erratic behavior led the officers to reasonably believe he would interfere with the search and possibly threaten their safety if allowed to remain in the yard or on the porch. While in the squad car, Joseph was not handcuffed and was told he was not arrested. See El-Ghazzawy v. Berthiaume, 708 F. Supp. 2d 874, 882 (D. Minn. 2010) ("Handcuffs are a hallmark of a formal arrest."). The squad car windows were also open and Joseph was provided with paramedic attention, an ice pack, and an inhaler. Based on these circumstances, requiring Joseph to sit unhandcuffed in the ventilated squad car for under an hour was the least intrusive manner of detaining him while the police conducted their legal search of his mother's residence.

Because the investigative detention did not last longer than necessary and the officers used the least intrusive means reasonably available, no de facto arrest occurred. Defendants are entitled to qualified immunity on Joseph's § 1983 claim for unlawful arrest.

### 3. Unlawful Detention (Count III)

Defendants argue they are entitled to qualified immunity on Joseph's claim for unlawful detention because the detention was lawful, and the manner and length of the detention was reasonable. Joseph responds that the detention was unlawful at the outset, and that even if the Court were to find the detention initially lawful it became unlawful when the officers refused to consider less restrictive means of detaining him. For the reasons discussed above, Joseph's detention in the squad car was lawful at the outset, and manner and length of the detention were reasonable. Defendants are entitled to qualified immunity on Joseph's § 1983 claim for unlawful

detention.

### 4. Excessive Force (Count IV)

Defendants argue they are entitled to qualified immunity on Joseph's excessive force claim because closing the squad car door on Joseph's foot was an accident and was not an intentional act in violation of 42 U.S.C. § 1983. Defendants further argue that Joseph's detention in the squad car for less than an hour in 80 degree heat with the window open did not constitute excessive force. Joseph does not dispute that the closing of the squad car door on his foot was an accident. However, he does argue that his detention in a hot squad car amounted to excessive force.

Excessive force claims arising in the context of an arrest or investigatory detention are analyzed under the Fourth Amendment's "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The relevant inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id.

Detaining an individual in a hot, unventilated squad car for an extended period of time can give rise to a Fourth Amendment violation. Burchett v. Kiefer, 310 F.3d 937, 945 (6th Cir.

2002).  In Burchett v. Kiefer, the Sixth Circuit found that a suspect's detention in a police car

with the windows rolled up on a 90 degree day constituted excessive force.  310 F.3d at 945.  On

the other hand, in cases where a detainee's confinement in a hot, unventilated vehicle lasted 30

minutes or less, no excessive force has been found.  See, e.g., Glenn v. City of Tyler, 242 F.3d

307, 314 (5th Cir. 2001) (finding no Fourth Amendment violation where arrestee with multiple

sclerosis was detained in an unventilated police vehicle in the sun for one-half hour and

complained she could not breathe and was dry heaving, but chose not to go to the hospital); Aria

v. Amador, 61 F. Supp. 3d 960, 976 (E.D. Cal. 2014) (holding that detainment in a "very hot"

car for less than 15 minutes did not amount to excessive force); Esmont v. City of New York,

371 F. Supp. 2d 202, 214 (S.D.N.Y. 2005) (finding no excessive force where suspect was left in

hot car for 10 minutes but suffered no injuries); Kanvik v. City of Reno, No. 06-58, 2008 WL

873085, at *11–12 (D. Nev. Mar. 27, 2008) (holding no excessive force where plaintiff was kept

in a squad car for 17 minutes on a 68 degree day).

    The circumstances here are distinguishable from Burchett and more closely resemble the

cases where excessive force has not been found.  In Burchett, the detainee was held in the squad

car for three hours on a 90 degree day, whereas Joseph was in the car for just under an hour on

an 80 degree day, with the door being opened and closed multiple times and never shut for more

than 22 minutes at a time.  Here, the squad car windows were open, not closed as in Burchett.

Significantly, the reason the Sixth Circuit found that the police had not used the least restrictive

means of detention in Burchett was the officers refused to roll down the windows:  "[T]he

officers had many equally effective alternative ways of detaining Burchett that would not have

subjected him to excessive heat, but their denial of his requests that they roll down the windows

to allow him air indicates a wonton indifference to this important safety factor. They could have left the windows slightly open, for example, or utilized the car's cooling or ventilation devices." Burchett, 310 F.3d at 945. Here, the squad car video establishes that Joseph's rear passenger window was open during most, if not all, of the time he was confined in the squad car. The officers also accommodated Joseph's request for medical assistance and an inhaler, and Joseph had an ice pack with him while he was in the vehicle.

Under the circumstances, the force used to detain Joseph was objectively reasonable and was not excessive. Defendants are entitled to qualified immunity on Joseph's § 1983 claim for excessive force.

## C. State Law Claims and Official Immunity

In addition to his claims under § 1983, Joseph asserts a state law claim for false imprisonment against all Defendants, and a state law claim for battery against Officers Notthakun and Titus and the City of St. Paul.[3] Compl. ¶¶ 70–75. Defendants argue official immunity bars Joseph's state law claims.

"[U]nder Minnesota law, a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn.1990). Law enforcement officers are "generally classified as discretionary officers who may be entitled to official immunity." Nelson v. Cnty. of Wright, 162 F.3d 986, 991 (8th Cir.1998) (citing Johnson, 453 N.W.2d at 42). "[A] public official charged by law with duties which call for the exercise of his judgment or

---

[3] Joseph alleges the City of St. Paul is liable on his state law claims under the doctrines of agency and respondeat superior. See Compl. ¶¶ 72, 75.

discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice Cnty., 423 N.W.2d 671, 677 (Minn.1988).

## 1. False Imprisonment (Count V)

Joseph claims Defendants falsely imprisoned him. "The action for the tort of false imprisonment or false arrest protects the personal interest in freedom from restraint of movement. The restraint may be imposed by the assertion of legal authority, and if an arrest is made without proper legal authority, it is a false arrest, and so false imprisonment." Lundeen v. Renteria, 224 N.W.2d 132, 135 (1974). As discussed above, Joseph was not arrested, and the officers had legal authority to temporarily detain him. As a result, Defendants are entitled to summary judgment on Joseph's false imprisonment claim.

## 2. Battery (Count VI)

Joseph also asserts a state law claim for battery. Battery is the intentional unpermitted offensive contact with another. Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn.1980). Minnesota law authorizes police officers to use reasonable force in effecting a lawful arrest or executing any other lawful duty. Minn. Stat. § 609.06, subd. 1(a), (d). To establish a claim of battery against an on-duty officer, Joseph must demonstrate that an officer used excessive force to effectuate his detention. Paradise, 297 N.W.2d at 155. As previously discussed, excessive force was not used in Joseph's detention. Accordingly, Defendants are entitled to summary judgment on Joseph's battery claim.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 12] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery

Dated: May 28, 2019                                ANN D. MONTGOMERY
                                                   U.S. DISTRICT JUDGE